# Fourth Court of Appeals
## San Antonio, Texas


## DISSENTING OPINION

No. 04-12-00294-CR

Vanessa **CAMERON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR4286C
Honorable Ron Rangel, Judge Presiding

Opinion by:   Rebeca C. Martinez, Justice
Dissenting Opinion by:  Karen Angelini, Justice

Sitting:      Catherine Stone, Chief Justice
              Karen Angelini, Justice
              Rebeca C. Martinez, Justice

Delivered and Filed:  September 18, 2013

Because I believe Appellant Vanessa Cameron failed to satisfy her burden of showing that

voir dire was not open to the public, I respectfully dissent.

The Sixth Amendment guarantees an accused the right to a public trial in all criminal

prosecutions. U.S. CONST. amend. VI. The Supreme Court in *Presley v. Georgia*, 558 U.S. 209,

213 (2010), confirmed that an accused's right to a public trial extends to the voir dire of prospective

jurors. However, the Supreme Court reasoned that the accused's right to a public trial is not

absolute and "may give way in certain cases to other rights or interests, such as the defendant's

right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."

*Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 45 (1984)). Thus, the Supreme Court explained that "before excluding the public from any stage of a criminal trial," the "party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 213-14 (quoting *Waller*, 467 U.S. at 48). That is, *to justify its decision to close its courtroom to the public*, a trial court must consider reasonable alternatives to closing the proceeding and must make findings adequate to support its decision to close the proceedings to the public. *See id.* If, however, a trial court does not close its proceedings, it is under no obligation to consider reasonable alternatives to closing the proceedings, nor must it make findings. *See id.* Thus, an appellate court should make a two-part inquiry. "[T]he first step for a reviewing court when analyzing whether a defendant's right to a public trial was violated is to determine if the trial was, in fact, closed to the public." *Lilly v. State*, 365 S.W.3d 321, 329 (Tex. Crim. App. 2012). "Once it is determined that the defendant's trial was closed to the public, the reviewing court decides whether that closure was proper." *Id.*

The majority states that in determining whether the proceedings were closed to the public, a reviewing court should look at the totality of the circumstances "which includes a determination of whether the court took every reasonable measure to accommodate public attendance." The majority then applies the *Waller* factors and concludes that the trial court failed in its "affirmative duty" to take every reasonable measure to accommodate public attendance. I disagree with the majority because I do not believe based on this appellate record Cameron met her initial burden of showing that the trial court had, in fact, closed the proceedings to the public.

In most cases, whether the trial court closed the trial to the public is not in dispute as often the trial is closed upon the granting of a motion by a party seeking to close the trial to the public. *See Lilly*, 365 S.W.3d at 329, 332; *see also Waller*, 467 U.S. at 48 (explaining that the prosecution sought to close trial proceedings to protect sensitive wiretap information); *Gannett Co. v. DePasquale*, 443 U.S. 368, 375-76 (1979) (stating that defendant requested media to be excluded from his trial due to pretrial publicity). Even in the context of voir dire cases, whether the trial was, in fact, closed to the public does not appear to have been an issue in most cases. *See Presley*, 558 U.S. at 210 (explaining that the record reflected that upon noticing a lone courtroom observer, the trial court explained to the observer that prospective jurors were about to enter and that he was not allowed to remain in the courtroom and had to leave that floor of the courthouse entirely); *Steadman v. State*, 360 S.W.3d 499, 500 (Tex. Crim. App. 2012) (explaining that the record showed the trial court denied the defense's request to have four members of his family and friends present during voir dire); *Garcia v. State*, 401 S.W.3d 300, 302 (Tex. App.—San Antonio 2013, pet. ref'd) (explaining that over the defendant's objection under the Sixth Amendment, the trial court denied the defendant's request to have three of his family members present during voir dire and excluded the family members); *Benson v. State*, No. 04-12-00159-CR, 2013 WL 1149028, at *2 (Tex. App.—San Antonio Mar. 20, 2013, no pet.) (concluding that the record reflected that the defendant asked the trial court to allow his parents to be present in the courtroom during voir dire and that the trial court denied his request and excluded his parents from voir dire).

Unlike the above cases, in *Lilly*, 365 S.W.3d at 324, the issue of whether a trial was in fact closed was in dispute on appeal. In that case, the court of criminal appeals considered whether a trial held in the prison-chapel courtroom of a maximum-security prison was closed to the public. *Id.* at 324-25. The court of appeals had held that the appellant's trial was not closed because there

was no evidence that anyone was "dissuaded from attempting" to attend, and there was no evidence that anyone was actually prohibited from attending appellant's trial. *Id.* at 331. The court of criminal appeals rejected this reasoning, explaining that "[w]hen determining *whether a defendant has proved that his trial was closed to the public*, the focus is not on whether the defendant can show that someone was actually excluded." *Id.* (emphasis added). Thus, unlike the majority suggests, the *Lilly* court did place an evidentiary burden on the defendant to show that his trial was in fact closed to the public.

The court of criminal appeals reasoned that rather than look to whether anyone was actually excluded from trial, a reviewing court should look to the totality of the evidence. *Id.* Thus, the court of criminal appeals considered the totality of the following evidence presented by the defendant: (1) visitors who wished to attend trial would have to pass through a front gate of the prison, followed by two fences with razor wire, and a series of three locked metal doors; (2) they would then be subjected to a physical pat-down search, be required to remove their shoes and belt, and be required to walk through a metal detector; and (3) before they could enter, they had to show a valid state-employee identification card or have the on-duty warden's approval. *Id.* Further, the court of criminal appeals explained that although there was conflicting testimony about whether a non-state employee not appearing on an inmate's visitor list could enter the prison without permission of the on-duty warden, "regardless of whether an individual attempting to enter the Unit is ultimately allowed entry, the prison keeps a record of the name and identification number (e.g., a person's driver's license number or TDCJ identification number) of anyone who attempts to enter the Unit and that identification is checked at each barrier." *Id.* Finally, the court of criminal appeals noted that other prison policies allowed guards at their discretion to prohibit visitors from entering the prison. *Id.* Looking at the totality of the evidence presented by the defendant, the court

of criminal appeals concluded that holding a trial in a prison was, in fact, closing the trial to the public. *Id.*

The majority seizes on the following paragraph in *Lilly* to explain why it concludes that whether the trial court fulfilled its affirmative "duty to consider all reasonable alternatives to accommodate the public," including "the option of splitting the venire panel," is relevant to its analysis of whether the trial was in fact closed to the public:

> When determining whether a defendant has proved that his trial was closed to the public, the focus is not on whether the defendant can show that someone was actually excluded. Rather, a reviewing court must look to the totality of the evidence and determine whether the trial court *fulfilled its obligation "to take every reasonable measure to accommodate public attendance at criminal trials."*

*Id.* (emphasis added) (quoting *Presley*, 558 U.S. at 215). Of course, in *Lilly*, the trial was held in a prison, and in evaluating whether trial was closed, the court of criminal appeals was considering the totality of the circumstances surrounding holding a trial in a prison. *See id.* It concluded that by the nature of a prison's highly restrictive admittance policies, as shown through evidence presented by the defendant, the trial was de facto closed. *See id.* The court of criminal appeals was not considering the *Waller* factors used to justify a closure, as later in its opinion, it considers whether the closure was justified. *See id.* at 332-33.

Here, unlike in *Lilly*, this trial was held in a public courthouse. Conducting a trial in a public courthouse is fulfilling the trial court's obligation to accommodate public attendance at criminal trials unless a defendant can show that the trial was in fact closed to the public. Cameron was obligated to meet her burden to show in looking at the totality of the evidence that voir dire was actually closed. Both the majority and I agree that this appellate record is not a model of clarity and is largely silent. However, unlike the majority, I believe that the silence in the appellate record

weighs against Cameron as it was her initial burden to show the trial was in fact closed to the public.

The record reflects that right before the voir dire panel was ushered into the courtroom, defense counsel stated the following:

> I noticed prior to the Court calling the case for trial, the bailiff ushered out or secluded [sic] the general public, to include family and friends of my client. I would ask that family and friends be allowed to be present here in the courtroom during the voir dire. They're excluded and I – if they're excluded, I would just put for the record an objection to the Sixth Amendment to the U.S. Constitution and article 1, section 10 of the Texas Constitution since she does have a right to the public trial.

The court responded by stating the following:

> We recognize their right to be present during the voir dire. I'm looking around the courtroom, and the jury panel – we have sixty-five jury panel members that are going to be here. I notice for the record that every single chair that we have available for attorneys that come in during trial and every chair that we have available for other people have been removed and placed in the jury area because that is the only way we can accommodate the number of jurors in this courtroom. So we're talking about sixty-five jury panel members. It's going to take up a huge majority of this courtroom, plus counsel table. I don't see any room whatsoever where anybody else would be able to sit and observe.

> Now, during – before we called the case, *we saw a pretty significant number of family members that were walking in*. There is no way this courtroom can accommodate them, and I certainly appreciate the security concerns of the State – excuse me, of the sheriff's department. It is a public trial. It's an open trial. Certainly people have the opportunity to observe. We just don't know where to put them, Mr. Esparza [defense counsel].

(emphasis added). Defense counsel then demanded a ruling from the court that the court was excluding the public, but the trial court adamantly stated,

> No. No, no. The court has never ruled that. I've never ruled that the public is excluded. All I'm saying is, where do you suggest we put them?

Defense counsel then suggested that chairs could be brought up right in front of the bench. The court replied that doing so would be an unacceptable security risk. The court then offered,

You want to open up those doors and have them all stand in that little hallway there so they can observe the whole thing? Maybe we could do that. Would that satisfy you?

(emphasis added). Defense counsel replied that he "just wanted an alternative." The following exchange then occurred:

COURT: I'm giving you alternatives. Which one would satisfy you in a way that the bailiffs would feel that their job in keeping the courtroom safe and secure would be satisfied?

DEFENSE: I can't suggest that. If you want to open those doors and put chairs and have people – have the public sit there, that's fine with me.

COURT: We don't have enough chairs. Are we going to – if you want, we can open up those doors in the back and have them stand to where they can observe and hear every single thing that's going on. . . . Counsel obviously wants her entire family here. I mean, I don't know what else we could do. . . .

(emphasis added). When counsel again demanded a ruling, the trial court replied that it "has never ruled [people have been excluded from the courtroom], so I'm not sure what it is you're object[ing] to." The court adamantly stated, "I'm telling you that the Court has never ruled that the public is excluded from jury selection." Thus, the record reflects that the trial court offered defense counsel the alternative of opening the doors to the courtroom and allowing a "significant" number of family and friends to stand in the foyer to the courtroom (or "the little hallway") where the family members could "observe and hear every single thing that's going on." The record also reflects that defense counsel implicitly rejected the trial court's offer by placing a condition on the trial court's suggestion: "If you want to open those doors and put chairs and have people – have the public sit there, that's fine with me."

Later, during a break in voir dire, the trial court again addressed the issue:

We're back on the record in 2010-CR-4286-C. By my calculation, the jury panel has been out of the courtroom for over – about half an hour now. Juror Number 25 . . . had a medical situation arise during the voir dire period and was just escorted – or just carried out of the courtroom by EMS. . . . And while we're on the record and

- 7 -

the jury is out, I know that the State is still in the middle of their general voir dire. I just want to put something on the record. Earlier defense asked if members of the defendant's family or other members could sit in, observe portions of the voir dire. *The Court did not close the proceedings by any means*, recognizing the First and Sixth Amendment rights to the extent of voir dire proceedings. During the course of discussions, the Court did analyze the four-prong questions tested out in [*Waller v. Georgia*], 467 U.S. 39. Specifically, the Court considered the size and configuration of the courtroom. Sixty-five venirepanel members have been summoned to the courtroom. In order to accommodate all sixty-five, there are about ten chairs that are placed in the gallery. Additionally, there are three or – three other chairs located next to the jury box. Every single chair in the gallery and in the jury box is filled with the sixty-five individuals. The court reporter is seated directly in front of the defense table directly in front of the jury box, so there would be no room there. Directly in front of the defense table there is a table used by the probation department that has a computer, a printer, some files. Directly next to the defense table is a panel that has been set up by the defense for use during voir dire. Directly behind that panel is a box where the bailiffs sit, a bailiff's table. The Court considered the size of the configuration. [The] Court also considered alternative courts, knowing that the juries – the central jury room is not adequately sufficient for a trial such as this. Also, the Court is expecting a potentially emotionally charged jury trial, this originally being filed, I believe, as a capital. I know that it is now a murder charge. As such, the space within the courtroom area for the participants and the bailiffs is very narrow. The Court does not want to make any jury or potential jurors feel in any way constrained with truthfulness and honesty, making them uncomfortable in regards to potential family members next to them. Essentially, the bottom line is the Court was concerned about safety and safety in the courtroom. *Recognizing that the courtroom is not closed*, Defense, before you begin your general voir dire, you're certainly able to bring in some family members and we will do our best to accommodate them in areas around the gallery where the Court, where the bailiffs feel the security will not be an issue. All right. Just wanted to put that on the record.

(emphasis added).

After Cameron was convicted, she moved for a new trial claiming that her right to a public trial was violated during voir dire. Attached to her motion were thirteen affidavits. Eleven of these affidavits are almost identical and state in pertinent part:

Around 10:30 a.m., the jury trial was set to begin. I walked into the courtroom along with other friends and relatives, and noticed that the gallery in the courtroom was about a quarter full. . . . Before we could sit down completely, the courtroom bailiff, one of the deputies assigned to the 379th District Court, approach[ed] our group that just entered and said in a loud authoritative voice that we all needed to clear the courtroom. The bailiff ejected our entire group and the general public and the

> entire gallery was cleared. The bailiff told us that a jury panel was going to come up and that they needed the gallery space for the panel and that unless you were a panel member, you could not be in the courtroom. I watched the bailiff usher everyone out of the courtroom, even though we came downtown just to see jury selection. We were not allowed in the courtroom during this time and no member of the public, other than panel members, entered the courtroom, it seemed. This was upsetting to me to be ejected in this manner and excluded from the courtroom. I thereafter left the courthouse *since it was apparent that we were not going to be let into the courtroom*. I never did see jury selection in the case and do not know what happened in that courtroom after the bailiff excluded me.

(emphasis added). Another affidavit by Cameron's mother, who is a sergeant in the San Antonio Police Department, is identical to the statements above, but also adds the following:

> I later asked the bailiff that morning [whether] I could enter the courtroom and just sit on the floor and was told that there was no room and that I was not permitted in the courtroom. I thereafter left the courthouse, as did the other relatives and friends, since it was apparent that we were not going to be let into the courtroom. I later learned that the court was willing to allow me personally to enter the courtroom and watch the remainder of voir dire in the afternoon, but I had already left the courthouse by that point and there was not going to be any allowance for the rest of our family or Vanessa's friends or the general public. I never did see jury selection in my daughter's case and do not know what happened in that courtroom after the bailiff excluded me.

Paul J. Goeke, a criminal defense attorney not associated with Cameron's case, affirmed that he saw the bailiff, Joe Gaska, approach a group of people who had just entered the courtroom and "in a loud, authoritative voice" order the entire gallery cleared. Goeke affirms that the "bailiff told the gallery that a jury panel was going to come up and that they needed the gallery space for the panel and that unless you were a panel member, you could not be in the courtroom." A final affidavit by Tonya Kersey affirms, "Around 4 p.m., I arrived and I was told that I could not come into the courtroom and so I waited outside until the jury selection was over. I tried to go into the courtroom when the jury was being picked, but they wouldn't let me."

The State filed a response to the motion for new trial and attached its own affidavits. Joe Gaska, one of the bailiffs, affirmed in pertinent part:

Jury selection began in Vanessa Cameron's case on February 21, 2012. In addition to our regular docket that morning, there were at least fifteen or twenty other people in the courtroom. When it came time to bring in the jury panel, I announced to all people in the court that we had to bring a jury panel of sixty-five people into the courtroom. I <u>never</u> said that no one could come back into the courtroom. I <u>never</u> told anyone to leave the courthouse.

I read Paul Goeke's affidavit wherein he states that I said "unless you were a panel member, you could not be in the courtroom." This is contrary to what I said. Goeke's statement insinuates I was telling people in the courtroom they had to leave unless they were on the jury panel. I would never make such [a] statement because as bailiffs, we actually escort the jury panel into the courtroom. There would be no opportunity for jury panel members to be in the courtroom at the time I am preparing for them to come in by placing jury numbers in the seats and so forth. Thus I would not address jury panel members that were not even in the courtroom.

Standard procedure in the 379th District Court is to clear the courtroom to let jurors be seated. Then for many trials we have placed chairs along walls to make seating available for the public and the defendant's family and friends. This particular defendant, Vanessa Cameron, had so many spectators that I recall the Court told her attorney he could open the doors and let the jurors stand in the hall to observe. I believe he was referring to the foyer. The foyer is basically a little hall/room about 8 feet by 8 feet right outside the back of the courtroom. This foyer connects the main hallway of the courthouse to our courtroom.

Although I do not remember when the conversation took place, I do remember being approached by Sylvia Cameron, the mother of the defendant. This possibly could have been when we were on a break from the voir dire due to an event where EMS was present. The courtroom was very crowded with veniremen, and one of the venire members experienced an episode requiring medical attention. When Sylvia Cameron asked if she could sit on the floor, I took it as a sarcastic remark from her, not as a serious request, and I was probably dismissive when I responded to her. My response to her was probably in the negative due to the attitude she displayed to me when she made the request.

Sylvia Cameron is a Sergeant with the San Antonio Police Department and her daughter was on trial for murder. I suspected that she would know that, in such a situation, it is a security risk to have individuals sitting on the floor where they might be out of sight of bailiffs. As a peace officer she is able to carry weapons in the courthouse. I certainly could not have her sitting out of sight, on the floor, potentially carrying a weapon which her daughter (defendant Vanessa Cameron – on trial for murder) probably knew about and could potentially reach during voir dire or any other time during the trial.

(emphasis in original). Also attached was an affidavit by Richard Villarreal, a bailiff, who affirmed that to his knowledge, "no one was excluded from the courtroom with the intention of not being allowed to watch the trial, including voir dire."

The trial court then made sixteen findings of fact:

1.  The Court <u>never</u> ruled that observers were excluded from the voir dire or any other part of the trial in this case.

2.  The defense attorney in this case seemed intent on objecting to a ruling that was not made (members of the public were not excluded from watching voir dire proceedings), and he did not seem serious about bringing members of the defendant's family or her friends back into the courtroom to observe.

3.  Prior to the venire panel entering the courtroom, the defense attorney never requested the Court to allow him to go outside and bring the defendant's family and friends into the courtroom; nor did he ask for a break to call family and friends to come into the courtroom. The Court made it clear that the public was <u>not</u> excluded from the courtroom.

4.  The Court offered to open up the doors in the back of the court and let the public observe from the hall area.

5.  The Court attempted to find places for the public to observe from.

6.  Suggestions were offered to the attorney for the defense regarding placement of observers, both on and off the record.

7.  Both on and off the record, suggestions were requested from the defense attorney as to where he would like the observers to be placed in the courtroom.

8.  Besides the time when the Court's bailiffs cleared the courtroom to bring the venirepanel in and get the panel seated, on two other occasions (one involving a venireman who had a medical episode and another involving a security alarm) the courtroom had to be cleared again.

9.  No court personnel ordered observers to leave the courthouse.

10. The Court did not order the bailiffs or anyone else to tell spectators to leave the courtroom.

11. The Court did not order the bailiffs or anyone else to tell spectators to leave the courthouse.

12. The bailiffs did not tell spectators that they should leave the courthouse.

13. The bailiffs did not tell spectators that they would not be allowed to watch the proceedings.

14. If observers had entered after the jury panel was seated, they would have been allowed back in the courtroom by the Court during the proceedings in this case.

15. Prior to voir dire in this case, the Court's bailiffs cleared the courtroom in order to make room to bring the venire panel into the courtroom and to get them organized and seated, but they did not tell any spectators that they were not allowed to watch the voir dire or any other part of the proceedings in this case.

16. During other trials in the past, including during voir dire proceedings, the 379th Court has had spectators in the courtroom.

(emphasis in original).

Thus, the trial court found that, based on the record and its own recollection, the courtroom had been cleared for short periods of time to allow the venire panel to be seated, during a medical emergency, and during a fire alarm. At oral argument, defense counsel conceded that the trial court could properly clear the courtroom for short periods of time under such circumstances. The trial court found that while the bailiffs did clear the courtroom to allow the venire panel to be seated, they did not tell spectators that they were excluded from watching the proceedings. The record supports the trial court's findings. I agree with the majority that the appellate record is silent on many factual considerations. However, I believe that it was Cameron's burden to show that under the totality of the evidence voir dire was closed to the public, and I do not believe that she met her burden. *See Lilly*, 365 S.W.3d at 331.

Further, because I believe the trial court correctly denied Cameron's motion to suppress and did not abuse its discretion in admitting rebuttal evidence of an alleged prior solicitation, I would affirm the judgment of the trial court.

Karen Angelini, Justice

PUBLISH